**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gladys F. MURILLO,**
**Defendant–Appellant.**

**No. 89–3261.**

United States Court of Appeals,
Fifth Circuit.

May 23, 1990.

Wayne D. Mancuso, Harahan, La., for defendant-appellant.

nevertheless undergo, and pay for, the newly acquired status as a dues payer. *Id.*

Patrice M. Harris, Robert J. Boitmann, Asst. U.S. Attys., John P. Volz, U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before WISDOM, POLITZ and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Gladys F. Murillo appeals her sentence for conviction of immigration law violations. For the reasons cited herein, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

In October 1988, the Immigration and Naturalization Service (INS) received information from a confidential informant (informant) that Gladys F. Murillo (Murillo) was selling seasonal agricultural worker applications for $1,500.00 to illegal aliens. During an ensuing investigation, the informant, working in cooperation with the INS, purchased immigration documents from Murillo. The purchased documents included a seasonal agricultural worker application and a pre-notarized affidavit in support of the application. On both documents, the space for the applicant's name was not filled in. Murillo advised the informant that similar documents could be purchased for relatives of the informant. Murillo also offered to arrange for transportation for the informant's relatives who were purportedly illegal aliens. Murillo stated that the documents and transportation would be provided at a cost of $1,500.00 per illegal alien.

On November 25, 1988, an undercover INS agent met Murillo at Murillo's home. On that occasion, Murillo advised the agent that documents and transportation could be arranged for the agent's cousins who were purportedly illegal aliens. This time the fee was quoted by Murillo as $1,100.00 per illegal alien with $500.00 to be paid up front for the documents. Murillo also informed the undercover agent that an additional $700.00 would be required in advance for transportation. Ultimately, the agent purchased only the documents from Murillo for $700.00 in cash.

As a result of the continuing investigation, INS agents learned that an illegal alien, Veronica Barraza–Arreola, purchased a bogus document from Murillo which verified Barraza–Arreola's employment with Peter Ybarra—a co-defendant in this case—on Ybarra's farm in Sweetwater, Texas. Murillo had arranged for Barraza–Arreola to travel to Ybarra's farm so that Barraza–Arreola might become familiar with the farm in case the INS questioned her. INS agents further learned that similar arrangements were made with another illegal alien, Elsa Aida Villabos–Gonzales. Villabos–Gonzales, when confronted by INS agents, admitted filing false documents.

On November 30, 1988, while executing a search warrant, officers seized several INS forms at Murillo's residence. Thereafter, Murillo was arrested and charged with nine counts of federal immigration law violations in four separate indictments. In the first indictment,[1] Murillo was charged with one count of conspiracy to smuggle aliens, in violation of 18 U.S.C. § 371, and three counts of concealing aliens from detection in violation of 8 U.S.C. § 1324(a)(1)(C). Murillo pled guilty to counts one and two of the first indictment. In the second indictment,[2] Murillo was charged with one count of special agricultural worker fraud in violation of 8 U.S.C. § 1160(b)(7)(A)(i). Murillo pled guilty to the second indictment. In the third indictment,[3] Murillo was charged with one count of special agricultural worker fraud in violation of 8 U.S.C. § 1160(b)(7)(A)(i) and one count of conspiracy in violation of 18 U.S.C. § 371. Murillo pled guilty to count two of the third indictment. In the fourth indictment,[4] Murillo was charged with two counts of special

1. Criminal Action No. 88–592 I.

2. Criminal Action No. 88–586 F.

3. Criminal Action No. 88–593 F.

4. Criminal Action No. 88–599 F.

agricultural worker fraud in violation of 8 U.S.C. § 1160(b)(7)(A)(i). Murillo pled guilty to count one of the fourth indictment.[5]

After conducting a presentence investigation and applying the Federal Sentencing Guidelines (guidelines), the probation officer determined Murillo's criminal history category to be I. With regard to the offenses charged in the first indictment,[6] the probation officer calculated the base offense level at nine under the guidelines. After adding four points to the base offense level for Murillo's organizational role in the offenses and three points because Murillo committed the instant offenses for profit, the probation officer arrived at a final offense level of fourteen. The probation officer then determined that the corresponding sentencing range under the guidelines was from fifteen to twenty-one months' imprisonment.[7]

As justification for the four point upward adjustment for Murillo's role in the offenses, the probation officer noted in the presentence investigation report that Murillo was an organizer of an ongoing criminal activity. In further support of the four point adjustment, the probation officer stated in the presentence investigation report that it was "evident that [Murillo] was *running a business* in which she provided various illegal aliens with [illegal] documents." (emphasis added). Nevertheless, the probation officer stated in the presentence investigation report that there were no factors warranting departure from the guidelines.

After reviewing the pre-sentence investigation report, neither the defendant nor her counsel objected to the probation officer's conclusions that Murillo was an organizer of and had been running a criminally

oriented business.[8] The government, however, did object to the probation officer's conclusion that there were no factors warranting departure from the guidelines. The government, in its objections to the presentence investigation report, stated a belief that "countless illegal aliens" had been helped by Murillo and that the "integrity of the amnesty system in the Eastern District of Louisiana [had] been severely compromised because of the illegal acts of Ms. Murillo."

The district court, concluding that the range under the guidelines did not adequately address the severity of the offenses charged in the first indictment, imposed a sentence of forty-eight months. In support of the upward departure, the district court echoed the probation officer's conclusion in the presentence investigation report that Murillo was "in the business" of selling false documents. Additionally, the district court, ostensibly relying on the government's objections to the presentence investigation report, echoed the government's belief that "countless illegal aliens" had benefited from Murillo's illegal activities and that Murillo's actions had "severely compromised" the amnesty program in the State of Louisiana. Thereafter, Murillo timely filed the instant appeal.

## II. DISCUSSION

On appeal, Murillo contends that, although the forty-eight month sentence imposed by the district court was within the statutory limits, the district court's upward departure from the guidelines was error. This Court has held that sentences which fall within the statutory limits, even though constituting an upward departure from the guidelines, will not be disturbed absent an "gross abuse of discretion."

---

**5.** The remaining counts in the four indictments were dismissed on motion of the government pursuant to a plea bargain agreement.

**6.** The sentence on conviction arising out of the charges in the first indictment is at issue in this appeal. The sentences for convictions on the other three indictments are not.

**7.** It is significant to note that although the offenses charged in the other three described in-

dictments are not at issue in this appeal, the base offense levels in those offenses were also adjusted upward because of the probation officer's conclusion that Murillo had organized and been running an illicit business for profit.

**8.** Murillo and her counsel did make objections to other parts of the report, however, no objection pertained to this particular conclusion of the probation officer.

*United States v. Juarez–Ortega,* 866 F.2d 747, 748 (5th Cir.1989) (citation omitted). When departing from the guidelines, however, the district court must articulate reasons justifying the upward departure. If the reasons are "acceptable" and "reasonable," this Court will affirm. *United States v. Velasquez–Mercado,* 872 F.2d 632, 637 (5th Cir.1989).

■ In the instant case, the district court, in departing upward from the guidelines specifically found that

countless illegal aliens received benefits under the [amnesty] program as a result of the illegal acts of Gladys Murillo.... All evidence in this case indicates that Ms. Murillo was in the business of providing false documents for payment to illegal aliens and, as well, facilitated illegal entry of some of these aliens into the United States for purposes of filing these amnesty applications. The Government's evidence also indicates that she was indeed aided and abetted by other individuals.... The integrity of the amnesty system in the Eastern District of Louisiana [was] severely compromised because of the illegal acts of Ms. Murillo.

Vol. 2 Rec. at 9–10. As alluded to previously, this finding of the district court is primarily supported by the probation officer's conclusion in the presentence investigation report that Murillo was the organizer and operator of an illicit business. The finding has further, albeit marginal, support in the government's conclusory statements contained that in its objections to the presentence investigation report to the effect that "countless aliens" were helped by Murillo and that her actions have "severely compromised" the amnesty program in the Eastern District of Louisiana. From our review of the record, it would appear the district court relied entirely on information contained in the presentence investigation report and its addenda in assessing sentence against Murillo. We are thus faced with the question of whether a district court may justify its upward departure

from the guidelines solely on the basis of information contained in a presentence investigation report.

In order to answer this question, we turn to the relevant statutory authority. Section 3661 of Title 18 of the United States Code provides that

*[n]o limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

(emphasis supplied). Section 1B1.4 of the guidelines echoes the above language and provides that

[i]n determining the sentence to impose within the guidelines range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, *any information* concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.

(emphasis supplied). As the Commentary to section 1B1.4 of the guidelines observes, section 3661, which recodified 18 U.S.C. § 3577, "makes it clear that Congress intended that no limitation would be placed on the information that a court may consider in imposing an appropriate sentence under the [then] future guidelines sentencing system." Thus, in departing upward, the district court's authority to consider information regarding the defendant, whether the considered information be extraordinarily relevant or elusively tangential, remains quite broad. In view of such a clear and unequivocal congressional mandate, we conclude that a district court acts within its discretion in relying solely on information contained in a presentence investigation report in departing upward from the guidelines in assessing sentence.[9]

■ Having so concluded, we next determine whether the district court's finding that Murillo was running an illicit business that had severely compromised the amnes-

---

**9.** In so concluding, however, we express no opinion on what weight a trial judge should give the information contained in a presentence in-

vestigation report. We prefer to leave that decision to the discretion of the district courts where it best belongs.

ty program of the Eastern District of Louisiana was clearly erroneous. In reviewing the district court's findings in support of upward departure, this Court must "accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(d); *United States v. Mejia-Orosco*, 867 F.2d 216, 221 (5th Cir.1989). In determining whether findings of fact are clearly erroneous, this Court follows the mandate of the Supreme Court in *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In *Bessemer*, the Supreme Court instructed that

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently.

*Id.* at 573–74, 105 S.Ct. at 1511.

At the outset, we emphasize that we are faced with a record devoid of either an offense report or other reports prepared by those officers who participated in the investigation which led to Murillo's arrest. Likewise, the record on appeal does not consist of a transcription of trial proceedings because Murillo's conviction was the result of a plea bargain agreement. We are therefore compelled to rely on information contained in the presentence investigation report and the transcript of the sentencing proceedings. We do note, however, that probation officers, in the preparation of the presentence investigation reports, regularly rely on offense and other investigatory reports. Accordingly, we are prepared, as was surely the district court, to view the probation officer's recitation of the facts surrounding Murillo's offense in this case with considerable deference. Moreover, we note that Murillo and her

counsel had the opportunity to review and make objections to the probation officer's proposed findings of fact contained in the presentence investigation report. Neither Murillo nor her counsel objected to the probation officer's proposed findings of fact that Murillo had organized and was running an illicit business.

The transcript of the sentencing proceedings contains the government's assertion that during the search of Ms. Murillo's house, "innumerable applications" were found.[10] The transcript also contains the government's assertion that, although the total number of individuals who illegally received amnesty through Murillo's activities would likely not be known, "over a dozen [illegal aliens] applied for amnesty."[11] Vol. 2 ROA at 13. On the other hand, the transcript recites Murillo's counsel's contention that Murillo only "happened to assist two or three individuals." Vol. 2 ROA at 11. In short, the record with which we are presented is considerably less than comprehensive. Nevertheless, reviewing the record in its entirety as we are bound to do, we are unable, in light of the applicable Supreme Court standard, to view the district court's findings justifying upward departure as clearly erroneous. We base our conclusion in part on the repeated references in the transcript and the presentence investigation report regarding the quantity of immigration forms possessed by Murillo. We further base our conclusion on the probation officer's considered opinion, which resulted from the officer's own investigation, that Murillo was "running a business" which had affected numerous aliens. In sum, although the evidence presented by this record is not extensive, it is nevertheless sufficient to sustain the district court's conclusion that Murillo's illegal actions had severely com-

---

10. Nowhere in the record on appeal is found a recitation of the exact number of illicit forms seized when Murillo was arrested. The presentence investigation report states that during the course of the investigation leading to Murillo's arrest, agents observed "several immigration papers lying about [Murillo's] home." The report also states that, at the time of Murillo's arrest, "several fraudulent documents" were seized.

11. Because of the privacy afforded aliens who apply for benefits under amnesty programs, the Government is unable to pursue criminal charges against them and seek their deportation without independent evidence.

promised the amnesty program in the Eastern District of Louisiana. The district court's findings are not clearly erroneous.

■ Last, we determine whether the district court's factual findings stated adequate reasons for departing upward from the guidelines. Section 5K2.7 of the guidelines provides that

[i]f the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guidelines range to reflect the nature and extent of the disruption and the importance of the governmental function affected.

The district court's reason for upward departure was a result of the court's conclusion that "the integrity of the amnesty system in the Eastern District of Louisiana [was] severely compromised because of the illegal acts of Ms. Murillo." As discussed above, such a conclusion finds support in the record and can be easily construed to mean that the district court concluded that Murillo's activities resulted in significant disruption of a governmental function. As such, the district court's reason for departure is valid under the guidelines. Moreover, such a justification is "reasonable" and "acceptable." *United States v. Velasquez-Mercado*, 872 F.2d 632, 637 (5th Cir. 1989).

### III. CONCLUSION

The district court properly concluded that Murillo was operating an illicit business which had compromised the integrity of the Immigration and Naturalization's Amnesty program in the Eastern District of Louisiana. Such a conclusion was a reasonable and acceptable reason for departing upward from the guidelines in assessing Murillo's sentence. The judgment of the district court is affirmed.

AFFIRMED.

POLITZ, Circuit Judge, dissenting:

Concluding that the record before us does not support critical factual findings, and that the district court incorrectly applied the Sentencing Guidelines and assigned insufficient reasons for departing upward from the guidelines, I respectfully dissent.

### The Factual Record

As the majority notes, the record before us is both scant and sketchy. Essentially we have the government's charges in the indictments, the defendant's plea of guilty to several counts pursuant to a plea agreement, the presentence investigation (PSI), and the comments of the prosecutor and defense counsel at the brief sentencing hearing. The majority concludes that this record sufficiently supports the trial court's factual findings; I respectfully disagree.

Distilling the facts before us, and relying heavily on the PSI, I find only three aliens whom Murillo helped to make illegal entry into the United States. These three, found at her home, were Valentin Ruiz-Martinez, Sergio Geovanny Alvarado-Alberto, and Jose Gabriel Morante-Alcola. Ruiz was the son of Murillo's live-in boyfriend and Alvarado was the son's friend. Murillo's boyfriend gave her the money to give to a third party to bring his son and his son's friend into the country. In addition, Murillo helped two other aliens file falsified applications for adjustment of status and was apprehended in an undercover operation wherein she agreed to help, for pay, two other aliens purportedly desirous of illegal entry and status.

Other than the five aliens actually assisted and the two fictitious aliens who were the subject of the undercover operation, the record contains only allusions and conclusionary statements by the prosecutor. We confront the anomaly of critical facts being supported only by vague, general charges and by the absence of proof to the contrary. I find this unacceptable conceptually. I find it even more unacceptable as applied herein.

The district court found that "[a]ll evidence in this case indicates that Ms. Murillo was in the business of providing false documents for payment to illegal aliens...." Perhaps "all of the evidence" does that, but "all of the evidence" in this record simply is inadequate to prove anything.

After noting Murillo's involvement with the five actual and two fictitious aliens, the PSI noted that agents found "several fraudulent documents" in Murillo's home. Based on this information the probation officer concluded that Murillo "was running a business in which she provided various illegal aliens with necessary documents to apply for necessary forms." The prosecutor sought to buttress this by making the statement at sentencing "When we did the search of Ms. Murillo's house, we found several, innumerable applications. I don't know how many at this time...." No support whatsoever was offered for counsel's statement. In addition, the prosecutor opined that because of Ms. Murillo's acts the amnesty system in the entire Eastern District of Louisiana was severely compromised. Defense counsel countered by saying that only the aliens named in the indictments, plus the two in the undercover operation, were actually involved.

Based on the PSI, which suggested that there was no basis for departure, and the statements of the prosecutor, which were accepted uncritically and at face value by the district court, the trial court found as a fact that Ms. Murillo ran a thriving business of aiding aliens for pay and that "countless illegal aliens" were involved. The connotation of "countless" is unfortunate, albeit accurate, for there was indeed no count beyond the seven. So said the PSI; so said the prosecutor. The lack of a reliable count does not equate to an innumerable count. But that was the result. Finally, the court accepted the prosecutor's bald statement that Ms. Murillo had single-handedly severely compromised the amnesty program in the whole Eastern District of Louisiana. I glean no record support whatever for that finding. If one swallow does not make a spring then surely five real and two fictitious aliens, several fraudulent documents and an uncounted supply of blank forms does not an amnesty-program disaster make.

### Application of the Guidelines

Murillo was sentenced in April 1989. The applicable Guidelines are those in effect at that time.

The PSI applied Guideline § 2L1.1, secured a starting base offense level of 9, and then added three levels because the offense was committed for profit. I view this as error. In 1989 Guideline § 2L1.1(b) provided for a reduction of three levels if the offense was committed other than for profit.

In making its three-level increase, the PSI cited to Guideline § 2L2.1(b)(1). This apparently was the source of the understandable confusion leading to the computation error. In April 1989 the Guidelines provided:

2L1.1 —base offense level of nine with a three-level reduction if the offense was committed other than for profit;

2L2.1 —base offense level of six, with a three-level addition if the offense was committed for profit.

Subsequently, 2L2.1 was amended to conform to 2L1.1.

Four levels were added by the probation officer because of Murillo's leadership role, and two levels were deducted for her acceptance of responsibility. The net base offense result was $9 + 3 + 4 - 2 = 14$.

The confusion is made manifest in the Sentencing Recommendation, which noted a guideline range of 12 to 18 months, but nonetheless, despite the PSI finding of no basis for departure, recommended 21 months incarceration, the period referred to by the trial court in sentencing.

As I understand the Guidelines the proper offense level should have been 11, providing a sentencing range of 8 to 14 months. I reach 11 by adding four to the base nine and deducting two for Murillo's acceptance of accountability—$9 + 4 - 2 = 11$.

### Departure

I understand that the trial judge bases his departure on the finding that Murillo had severely compromised the amnesty program in the Eastern District of Louisiana. Under Guideline § 5K2.7 disruption of a governmental function may serve as the basis of an upward departure. That guideline, however, is qualified. It continues: "Departure from the guidelines ordi-

narily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense...." It would seem that the charged immigration offenses inherently and necessarily interfere with the governmental immigration function.

The Sentencing Guidelines state, and our decisions underscore, that the sentencing range resulting from application of the Guidelines is the sentencing norm and that departures, upward or downward, should only be made for reasons not adequately considered by the Sentencing Commission. I perceive no such basis for an upward departure herein.

For these reasons I respectfully DISSENT.