E. GRADY JOLLY, Circuit Judge.
 

 I
 

 Lois Marcella Billingsley (Billingsley) pleaded guilty of theft of a U.S. treasury check. She was sentenced to 120 months imprisonment, to be followed by three years of supervised release.
 

 Police in Nolanville, Texas, entered the apartment of Margaret Cassibo (Cassibo) on March 6, 1991. Cassibo lay dead on the floor, very close to the front door. She had been strangled, stabbed in the back of the head, and beaten in the face. The pattern of blood splatters on the front door indicated that Cassibo was attempting to escape and was on her knees while her attacker stabbed her repeatedly with a blunt instrument. Near Cassibo’s body was an open sleeper-sofa. On the sleeper sofa was a single earring. Next to Cassibo’s body was a box that contained a pot and potting soil. Also in the box was a three-pronged garden trowel. There was no planting trowel in the box. Police found neither a purse nor any cash in Cassibo’s apartment. There was no sign of forced entry.
 

 Ruth Blankenship, a neighbor, told police that she heard an argument coming from Cassibo’s apartment around 10:00 p.m. on March 4. Blankenship identified a photograph of Billingsley. She described Bill-ingsley as a person who frequently borrowed money from Cassibo and sometimes went to play bingo with Cassibo. Blankenship saw a dark blue two-door Ford parked outside Cassibo’s apartment on March 2 and March 3. The Ford was parked outside the apartment all night on March 3. Blankenship did not see Cassibo place her trash outside on the morning of March 5. Blankenship heard Cassibo’s phone ring several times. She heard no answer. Blankenship said that Cassibo kept large amounts of cash in her apartment.
 

 Lori Ann Feeney, another neighbor, saw a dark blue two-door car in the driveway of Cassibo’s apartment on March 3 and March 4. Feeney saw Cassibo exit the car and heard voices outside. Feeney did not see the driver. Feeney could not recall Cassibo ever having had an overnight visitor.
 

 Melanie Baker identified a photograph of Billingsley. Cassibo told Baker that she was uncomfortable around Billingsley. According to Baker, Cassibo caught Billings-ley looking through Cassibo’s jewelry and other belongings. Cassibo told Baker that Billingsley frequently asked for money and that Billingsley owed money to many peo-, pie. Baker could not recall Cassibo ever having had an overnight visitor. According to Baker, Cassibo lacked the strength to open the sleeper-sofa.
 

 A bingo parlor employer told police that Billingsley frequently asked Cassibo for money at the bingo parlor. Many witnesses told police that Billingsley would appear at bingo games and sit as close as she could to Cassibo. Delores Hardin, a friend of Cassibo, told police that Cassibo carried large sums of cash in her purse. Cassibo’s acquaintances said that Cassibo lived on social security and veterans’ benefits. They also said that she kept large sums of cash on hand.
 

 Billingsley owned a dark blue Ford Thunderbird. Blankenship and Baker identified a photograph of Billingsley’s car as the one they saw in Cassibo’s driveway.
 

 Billingsley had written several thousand dollars of bad checks in Bell County, Texas. She had an appointment on March 4 with the Bell County district attorney to settle the bad check cases against her.
 

 According to police, Billingsley left the area on the night of Cassibo’s murder. Billingsley’s husband told police that he had tired of fights with Billingsley and of her writing bad checks on his account. He asked her to leave on March 4. Billingsley said that she was going to stay with her daughter, Rachel Caininberg. Caininberg told police that Billingsley came to her home but that she would not allow Billings-ley to stay. Billingsley told Caininberg that she was going to Cassibo’s house.
 

 
 *864
 
 The Texas police, on August 10, 1991, received notice from Oklahoma police that a deputy had stopped and released Billings-ley before discovering that she was wanted for theft by check. The deputy saw Bill-ingsley drive towards Texas.
 

 Police later received information that Billingsley was in Belton, Texas, on August 10. Caininberg and her boyfriend later told police that Billingsley had appeared in Belton on August 10. Billingsley told Cai-ninberg that she was facing 60 years in prison. Caininberg and her boyfriend drove Billingsley to Oklahoma City on August 11. Billingsley left her car in a restaurant parking lot in Belton.
 

 Police searched Billingsley’s car. In the car they found a gardening trowel and a Phillips-head screwdriver. Police did not find blood on either implement.
 

 Oklahoma City police located Billingsley and arrested her on a bad check warrant. Billingsley first told Oklahoma City police that she had fled Texas because of the bad check charges and that Cassibo was fine when Billingsley left. She said that Cassi-bo was a bingo partner and that she did not remember Cassibo’s last name. Billingsley appeared shaken when police told her Cas-sibo was dead. She admitted borrowing money from Cassibo, but insisted she had paid Cassibo back. She told her interrogator that she went to Cassibo’s apartment from the county courthouse on the morning of March 4. Cassibo was not home. Bill-ingsley found Cassibo’s wallet, which contained money, on the porch. She took the wallet with the intention of sending it back. She explained that she had opened Cassi-bo’s sleeper-sofa on March 1 because Cassi-bo was expecting .visitors. Billingsley provided her interrogator several of Cassibo’s identification cards.
 

 Texas and Oklahoma police searched Bilb ingsley’s Oklahoma City apartment. They found mail from the American Association of Retired Persons (AARP) addressed to Cassibo; a piece of paper with several signatures of Cassibo’s name; an unmailed letter addressed to Caininberg that contained a return address different from Bill-ingsley’s apartment; an earring; a stained sweater; and a stained nightgown. The garments were sprayed with the chemical Luminal and tested positive for the presence of blood. Billingsley told a police officer that she could wear only one earring. In the letter to Caininberg, Billings-ley instructed her daughter not to give out her Oklahoma City address.
 

 Later that day, Billingsley told police that she last saw Cassibo on March 3 and that she found Cassibo’s wallet on March 3 when she went to Cassibo’s apartment. She denied knowing of Cassibo’s murder. She said that she had been attempting to evade police because of her bad checks. She admitted to being a compulsive bingo player.
 

 Billingsley’s interrogator pointed out to Billingsley the inconsistency of her stories. Billingsley then said that she went to Cas-sibo’s apartment on March 4 and drank coffee with Cassibo until early in the evening. Cassibo was alive when Billingsley left. Billingsley returned to Cassibo’s apartment around 7:30 p.m. Cassibo then was dead. Billingsley took Cassibo’s purse and left. Billingsley then ended the interview and requested an attorney.
 

 Billingsley spoke to Texas Ranger John Aycock (Aycock) as the two travelled from Oklahoma to Texas. She said that she went to Cassibo’s apartment on the morning of March 4 and did not go to court. She left briefly and returned at mid-morning. She and Cassibo played cards, drank coffee, and pieced together a puzzle during the afternoon. Billingsley slept briefly on the sleeper-sofa. She left Cassibo and went to a bingo game at 7:30 p.m. After bingo, Billingsley returned to Cassibo’s apartment. She found Cassibo dead. She felt Cassibo’s body. She went to the bathroom to vomit. She took Cassibo’s purse from the living room. She then went on the lam — first to Houston, where she cashed Cassibo’s checks; thence to Louisiana, Georgia, Florida, Texas, Oklahoma, Texas, Kansas, and back to Oklahoma. Billingsley admitted that she knew that Cassibo received her checks from the Government around the first of the month.
 
 *865
 
 She admitted her bingo addiction to Aycock and spoke enthusiastically about the game.
 

 Aycock spoke with 'the medical examiner who examined Cassibo. Both Aycock arid the medical examiner thought it possible that the garden trowel found in Billings-ley’s car was used to stab Cassibo.
 

 II
 

 Billingsley pleaded guilty of theft of one of Cassibo’s checks. The probation officer determined Billingsley’s base offense level as six. She determined that Billingsley’s offense involved the conscious or reckless risk of serious bodily injury to Cassibo and increased the offense level to 13. To that she added two levels because Cassibo was a vulnerable victim. The probation officer calculated Billingsley’s criminal history score as two, thus placing her in' criminal history category II. She advised that the district court could depart upward from the guideline sentencing range because Bill-ingsley killed Cassibo in a heinous manner.
 

 Aycock' testified at the sentencing hearing about the police investigation of Bill-ingsley. Police officer Will Pitrucha also testified at the hearing.
 

 The district court did not find that Cassi-bo was a vulnerable victim. The court otherwise accepted the probation officer’s recommendations. The court thus calculated the offense level as 13 and placed Bill-ingsley in criminal history category II. The sentencing range for a level-13 offender in category II is 15-21 months. U.S.S.G! § 5A, Sentencing Table. The district court found that Billingsley murdered Cassibo. The court departed upward from the guideline range to the maximum statutory' sentence of 120 months.
 

 III
 

 Billingsley first contends that the district court erred by departing upward from the guideline range based on Cassibo’s death. Billingsley argues that the Sentencing Commission took death into account when it provided for an adjustment for risk of serious bodily injury; that there exists insufficient evidence for the departure; and that the extent of the departure is unreasonable.
 

 A district court may depart upward from the range provided by the Sentencing Guidelines if the court “finds that there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission[.]” 18 U.S.C. § 3553(b). The Guidelines provide that
 

 [i]f death resulted, the court may increase the sentence above the authorized guideline range.
 

 Loss of life does not automatically suggest a sentence at or near the maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant’s state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the danger-ousriess of the defendant’s conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidélines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.
 

 U.S.S.G. § 5K2.1 (Policy Statement). Under the guideline applicable to Billingsley’s offense, “[i]f the offense involved the conscious or reckless risk of serious bodily injury, increase by 2 levels. If the resulting offense level is less than level 13, increase to level 13.” U.S.S.G. § 2Fl.l(b)(4). The Guidelines define “serious bodily injury” as “injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.” U.S.S.G. § 1B1.1,
 
 comment.
 
 (n.
 
 m-
 

 
 *866
 
 Research discloses no cases that discuss the relationship between § 2Fl.l(b)(4) and § 5K2.1. We think that the serious-bodily-injury adjustment does not preclude a departure for death. First, the guideline definition of “serious bodily injury” does not include death. Second, the death-departure guideline instructs that the extent of departure should depend, in part, on “the extent to which death or serious injury .was intended or knowingly risked[.]” U.S.S.G. § 5K2.1. Third, had the Sentencing Commission considered death as falling within “serious bodily injury,” it probably would have provided for an adjustment to an offense level higher than 13.
 

 A reviewing court will affirm an upward departure that is within statutory limits so long as the departure does not constitute a “ ‘gross abuse of discretion.’ ”
 
 U.S. v. Murillo,
 
 902 F.2d 1169, 1171 (5th Cir.1990) (citation omitted). “When departing from the guidelines, however, the district court must articulate reasons justifying the upward departure. If the reasons are ‘acceptable’ and ‘reasonable,’ this court will affirm.”
 
 Id.
 
 at 1172 (citations omitted). The district court may depart on the basis of death only when there exists a “ ‘nexus’ between the harm caused and the offense of conviction.”
 
 U.S. v. Ihegworo,
 
 959 F.2d 26, 30 (5th Cir.1992).
 

 Generally, the government must prove sentencing facts by a preponderance of the evidence.
 
 U.S. v. Casto,
 
 889 F.2d 562, 569-70 (5th Cir.1989),
 
 cert. denied,
 
 493 U.S. 1092, 110 S.Ct; 1164, 107 L.Ed.2d 1067 (1990). The Third Circuit holds that due process requires the government to prove sentencing facts by “clear and convincing” evidence when the district court makes a departure of great magnitude.
 
 U.S. v. Kikumura,
 
 918 F.2d 1084, 1101 (3rd Cir. 1990). In
 
 Kikumura,
 
 the district court departed upward from a range of 27-33 months to 30 years.
 
 Kikumura,
 
 918 F.2d at 1094, 1098. Other circuits have noted
 
 Kikumura
 
 with' approval but have not applied it.
 
 U.S. v. Restrepo,
 
 946 F.2d 654, 661, n. 12 (9th Cir.1991) (en banc),
 
 cert. denied,
 
 — U.S. —, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992);
 
 U.S. v. Townley,
 
 929 F.2d 365, 370 (8th Cir.1991). The Seventh Circuit, however, has noted that the “clear and convincing” standard is not constitutionally-required.
 
 U.S. v. Masters,
 
 978 F.2d 281, 287 (7th Cir.1992).
 

 We find no cases in which this court has considered whether to apply the “clear and convincing” standard to large-scale departures. However, we need not decide that issue in Billingsley’s case. The district court stated that the evidence was sufficient under either the “preponderance of the evidence” or “clear and convincing” evidence standard to prove that Billingsley killed Cassibo.
 

 Indeed, the evidence is ample to satisfy either standard. A district court may consider hearsay evidence when making sentencing determinations, so long as the evidence has “sufficient indicia of reliability to support its probable accuracy.”
 
 U.S. v. Cuellar-Flores,
 
 891 F.2d 92, 93 (5th Cir.1989) (internal quotations and citation omitted); U.S.S.G. § 6A1.3(a). Further, the PSR is reliable evidence at a sentencing hearing.
 
 See, e.g., U.S. v. Richardson,
 
 925 F.2d 112, 115 (5th Cir.),
 
 cert. denied,
 
 — U.S. —, 111 S.Ct. 2868, 115 L.Ed.2d 1034 (1991). The district court thus properly considered Aycock’s testimony and the PSR at the sentencing hearing.
 

 Cassibo was stabbed in the back of the head with a blunt instrument. Aycock and the medical examiner both believed that the gardening trowel found in Billingsley’s car could have been used to cause Cassibo’s wounds. Furthermore, such a trowel was missing from Cassibo’s house. The police found an earring in Cassibo’s sleeper-sofa. Billingsley could wear only one earring. Police found garments in Billingsley’s Oklahoma City apartment that tested positive for blood.
 

 Cassibo’s neighbors knew Billingsley as a person who pestered Cassibo for money and even rifled through Cassibo’s valuables on occasion. They knew that Cassibo was uncomfortable around Billingsley. They saw Billingsley’s car in Cassibo’s driveway
 
 *867
 
 on the night before the murder and on the date of the murder.
 

 Billingsley was apparently in desperate personal and financial straits. Her husband kicked her out of their home. She had criminal bad-check charges pending against her on the date of the murder. Billingsley knew that Cassibo received her Government checks around the beginning of the month.
 

 After Cassibo’s death, Billingsley went on the lam and travelled widely. She told her daughter that she faced 60 years in prison if arrested. She also told her daughter not to reveal her Oklahoma City address.
 

 Finally, Billingsley gave police contradictory accounts of her actions on March 4, 1991. Inconsistent or implausible accounts of events are evidence of guilty knowledge.
 
 U.S. v. Arzola-Amaya,
 
 867 F.2d 1504, 1513 (5th Cir.),
 
 cert. denied,
 
 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989).
 

 The departure to the statutory maximum sentence is reasonable and acceptable. The evidence does not indicate provocation of the sort that would reduce a charge of murder to one of manslaughter. Indeed, the evidence indicates that Billingsley planned to kill Cassibo and take her Government checks. Cassibo was strangled and stabbed in the back of the head with a blunt instrument. Her killer intended to kill her and killed her in a heinous manner.
 

 IV
 

 Billingsley finally contends that the district court erroneously adjusted her offense level for knowingly or recklessly risking serious bodily injury to Cassibo. Any error by the district court in adjusting for the risk of serious bodily injury is harmless. The district court stated that the evidence showed “that Mrs. Billingsley did commit the murder of Mrs. Cassibo. Therefore, the statutory maximum would be the only appropriate sentence left to the court. That is the sentence in this case.” The court clearly intended to impose the statutory maximum sentence and would have done so even had it not adjusted the offense level upward for the risk of serious bodily injury.
 
 See U.S. v. Johnson,
 
 961 F.2d 1188, 1189, n. 1 (5th Cir.1992).
 

 V
 

 For the reasons stated in this opinion, the district court is
 

 AFFIRMED.