**UNITED STATES of America**

v.

**Darrel RIVIERE, Appellant.**

Nos. 90–3128, 90–3129.

United States Court of Appeals,
Third Circuit.

Argued Dec. 4, 1990.

Decided Jan. 31, 1991.

Robert L. Tucker, Federal Public Defender, James R. Holloway (argued), Asst. Federal Public Defender, Christiansted, Virgin Islands, for appellant.

Terry M. Halpern, U.S. Atty., David M. Nissman (argued), Chief Asst. U.S. Atty., Victoria Boynton, Special Asst. U.S. Atty., Christiansted, Virgin Islands, for appellee.

Before HIGGINBOTHAM, Chief Judge, and GREENBERG and COWEN, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

Darrel Riviere appeals from the judgments of conviction entered in the District Court of the Virgin Islands on two federal informations; one charging various firearms offenses, No. 89–41, and the second charging assault of a federal marshal, No.

89–133. The firearms information was filed in the district court after Riviere's extradition from the Commonwealth of Dominica on an arrest warrant issued by a magistrate of the district court on an information charging exportation of marijuana and possession of marijuana on an aircraft departing the United States. Riviere entered a conditional plea of guilty to several of the firearms offenses pending his appeal to test his contention that his prosecution for these offenses violated the extradition treaty between Dominica and the United States. The assault information was filed after Riviere resisted being transported to Puerto Rico from St. Croix pending his sentencing on the firearms offenses. He subsequently pleaded guilty to the assault of a federal marshal.

Riviere contends that inasmuch as he was not extradited for the firearms offenses, his prosecution for them violated the treaty applicable to Dominica–United States extraditions. He also asserts that his prosecution for the firearms offenses violated the double jeopardy and dual criminality provisions of the treaty and denied him due process of law, and that his extradition for the marijuana offenses was a sham. Finally, he urges that the district court erred in its application of the guidelines in sentencing on both the firearms and assault convictions.

We have jurisdiction under 28 U.S.C. § 1291 as well as under 18 U.S.C. § 3742(a), which provides that a defendant may file an appeal for review of an otherwise final sentence where the sentence "is imposed as a result of an incorrect application of the sentencing guidelines," *id.* § 3742(a)(2), or where the sentence is greater than the maximum sentence specified by the guidelines range, *id.* § 3742(a)(3).

We conclude that in light of an express waiver by the Commonwealth of Dominica of any restrictions on his prosecution by the United States, Riviere cannot successfully assert rights under the treaty. Furthermore, we hold that Riviere's due process rights were not violated and that the proceedings by which he was extradited were not a sham. We conclude, however, that the district court erred in applying the guidelines when it did not group the firearms convictions as closely-related counts and when it departed upward from the guidelines based on disruption of governmental functions on the assault conviction. We are satisfied, however, that the district court correctly refused to credit Riviere for acceptance of responsibility on the assault conviction. We, therefore, will affirm the judgment of conviction for the firearms offenses, but vacate both sentences and remand for sentencing.

## I. FACTS AND PROCEDURES

Dominican customs agents arrested Riviere when he arrived in Dominica on a chartered flight from St. Croix on April 6, 1989, in possession of machine guns, silencers, subsonic ammunition designed for use with silencers, electronic triggering devices, and a semi-automatic pistol with obliterated serial numbers. The agents found the weapons and a small quantity of marijuana in Riviere's possession and charged him with unlawful firearms possession and possession of marijuana. There is evidence in the record that Riviere offered Dominican officials a bribe of $5,000.00 to secure his freedom. App. at 251. On April 7, 1989, Riviere pleaded guilty in a Dominican court to six offenses arising from these events and was sentenced to 42 months in prison or a fine which he paid. *Id.* at 249.

It is clear that the matter quickly came to the attention of the United States government, for the United States Embassy in Barbados on April 7, 1989, requested that Dominica detain Riviere. A Dominican magistrate signed a warrant for Riviere's arrest on April 8, based on an accusation of an extraditable crime, and the warrant was executed on April 10. *Id.* at 243, 248. A formal arrest warrant for Riviere was then signed and issued on April 10, 1989, in St. Croix predicated upon violations of 21 U.S.C. §§ 953 and 955, which respectively prohibit exporting a Schedule I or II controlled substance (marijuana) and departing from the United States on board a vessel or aircraft in possession of such a controlled substance. App. at 250, 257.

The information upon which the warrant issued, No. 89–35, charged Riviere with these offenses as well as with an earlier incident involving possession of crack with intent to distribute in violation of 21 U.S.C. § 841(a). App. at 253. The embassy then again requested the Dominican government to detain Riviere for extradition but in its note referred only to the count for violating 21 U.S.C. § 955. Though this note is dated April 11, it was stamped received by the Dominican Attorney General's Office on April 10. App. at 257.[1]

A Dominican magistrate held an extradition hearing on April 12, 1989, under the Dominican Extradition Act of 1980 and the applicable Extradition Treaty Between the Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland, June 8, 1972 ("US–UK Treaty"), 28 U.S.T. 227, T.I.A.S. No. 8468 (entered into force on June 21, 1977).[2] Although the magistrate was troubled by the lack of proof of authenticity of the documentary evidence presented by the prosecution, he overruled Riviere's objection that a case under 21 U.S.C. § 955 for departing from the United States in possession of marijuana had not been established and, accordingly, on April 17, he signed a "form of warrant of committal" for Riviere's extradition. App. at 227, 240–41. This warrant indicated that Riviere was being surrendered for "the offence of Unlawfully exporting Narcotics," and was thus predicated on a violation of 21 U.S.C. § 953.

Notably, the Attorney General and Minister for Legal Affairs, Immigration, and Labour of Dominica on April 14, 1989, executed a waiver of "any and all Rights of Objection and Protest of the Commonwealth of Dominica" under Article XII of the US–UK Treaty. App. at 209. This instrument states that Dominica does not and will not object to Riviere's prosecution for "any and all criminal offences committed either prior to or subsequent to his Extradition," including "criminal offences the facts in respect of which were not established during the forementioned Extradition Hearing" and "criminal offences for which his Extradition was not requested." *Id.*

On May 2, 1989, a seven count information, No. 89–41, was filed in the District Court of the Virgin Islands against Riviere charging him with various firearms offenses.[3] *Id.* at 4–6. Riviere moved to dismiss the information, asserting that he was illegally extradited to the United States in violation of "his due process rights" and the extradition treaty, but the District Court of the Virgin Islands denied this motion on August 24, 1989. *Id.* at 8. On August 15, 1989, Riviere entered a conditional plea of guilty to counts one, five, and six of this information pursuant to a plea agreement in which the government agreed to dismiss Information No. 89–35,[4] charging the narcotics offenses, as well as a separate information, No. 89–34, asserting certain Virgin Islands charges. Counts one, five, and six, respectively, charged possession of a firearm by a felon, delivery

1. We cannot account for this discrepancy which may well have been nothing more than a clerical error.

2. The US–UK Treaty lists the Commonwealth of Dominica as a territory of the United Kingdom bound by the treaty. Although the Commonwealth of Dominica enacted the Extradition Act of 1980, app. at 212, this act is not a treaty that binds the United States.

3. In particular Riviere was charged with:
 Count 1: Possession of a firearm by a felon and by an unlawful user of a controlled substance, 18 U.S.C. § 922(g)(1)(3).
 Count 2: Possession of ammunition by a felon and by an unlawful user of a controlled substance, *id.* § 922(g)(1)(3).

Count 3: Possession of silencers by a felon and by an unlawful user of a controlled substance, *id.* § 922(g)(1)(3).
Count 4: Transporting machine guns, *id.* § 922(a)(4).
Count 5: Delivery of firearms to a common/contract carrier, *id.* § 922(e).
Count 6: Possession of an altered firearm, *id.* § 922(k).
Count 7: Possession of machine guns, *id.* § 922(*o*). App at 4–6.

4. It appears that the government agreed to dismiss the two counts in Information No. 89–35 relating to 21 U.S.C. §§ 953 and 955 independently of the plea agreement and to dismiss the count for violation of 21 U.S.C. § 841(a) pursuant to the plea agreement.

of firearms to a common/contract carrier, and possession of an altered firearm. The government also agreed to waive filing habitual offender papers,[5] and not to prosecute a fourth information in which Riviere was charged with assaulting a witness scheduled to testify against him. *Id.* at 22–23, 75.

Riviere was originally to be sentenced on the firearms counts on October 25, 1989, but the sentencing was postponed. On October 25, 1989, Riviere assaulted five federal marshals transporting him to the airport for a commercial flight to Puerto Rico, where he would be held until the new sentencing date. *See id.* at 13–15. The marshals then returned Riviere to prison on St. Croix until they could arrange alternative transportation.

As a result of this incident, Riviere was charged in Information No. 89–133 with five counts of assaulting the marshals while engaged in performance of their duties, contrary to 18 U.S.C. § 111. App. at 125. However, in exchange for Riviere's plea of guilty to one of the counts, the government agreed to dismiss the remaining four counts and not to file an habitual criminal information against Riviere. *Id.* at 108. Thus, Riviere was sentenced on both the firearms and assault informations on the same day.

The presentence report for the weapons offenses made the following computations. The base offense level was 9 for possession of firearms by a prohibited person, as established in guidelines § 2K2.1(a) prior to the amendment effective November 1, 1989.[6] But there was an increase in 1 level because of the obliterated serial numbers under guidelines § 2K2.1(b)(1), so that the

adjusted offenses level was 10. Inasmuch as the three firearms offenses were not grouped, 3 levels were added under guidelines § 3D1.4 so that the combined adjusted offense level was 13.[7] The report, however, provided for a 2-level reduction for acceptance of responsibility, so that the total offense level was 11. Inasmuch as his criminal history category was IV, the sentencing table provided for a range of 18 to 24 months.

The computations for the assault in the presentence report were as follows.[8] The base offense level under guidelines § 2A2.4(a) was 6, but there was a 3-level upward adjustment under guidelines § 2A2.4(b) for physical contact, for an adjusted offense level of 9, which was also the total offense level, as there was no adjustment for acceptance of responsibility. Based on the criminal history category of IV, the sentencing range was thus 12 to 18 months.

The report, however, suggested that an upward departure for the assault based on Riviere's status was appropriate because he was awaiting sentencing for his firearms offenses when he assaulted the marshal. *See* guidelines § 4A1.3(d). The suggested departure was that Riviere be sentenced as if his criminal history category was V instead of IV, so that the range of imprisonment would be increased from 12 to 18 months to 18 to 24 months. The presentence report also suggested upward departure was warranted because the offense level did not take into consideration the disruption of governmental function caused by the assault.

---

**5.** In 1981, Riviere was convicted of 14 felonies in St. Croix. Supp. app. 1. At that time, the District Court of the Virgin Islands sentenced him to 10 years with 5 years supervised probation consecutive to the prison sentence. *Id.* While incarcerated, he was convicted of assaulting an inmate, for which he received a one-month sentence to be served concurrently with his 1981 sentence. In March or April 1988, while on parole for the 1981 crimes, he was convicted of attempted assault in the third degree and sentenced to probation.

**6.** Throughout this opinion our references to the guidelines, application notes, and commentary are, except when otherwise indicated, to the versions effective at the time of the offenses.

**7.** The multiple count adjustment started from the conviction under count one for possession of a firearm by a felon, as the adjusted offense levels for the other two counts was 7.

**8.** There were separate presentence reports for the firearms and assault offenses, as the assault was committed after the firearms report was prepared.

Riviere submitted written presentencing calculations grouping the three firearms offenses to reach a total offense level of 8, after the 2-level reduction for acceptance of responsibility. Inasmuch as he agreed that his criminal history category was IV, he proposed a sentencing range of 10 to 16 months for the firearms offenses.

In his closing statement at sentencing, the government attorney argued that the presentence report calculation of the offense level for the firearms offenses was too low, because it failed to add 2 levels for obstruction of justice stemming from Riviere's attempt to bribe Dominican officials. App. at 146–47. He also contended that the offense level should have been increased by 2 levels, rather than the 1 level, for Riviere's knowledge that the weapons had obliterated serial numbers and that Riviere should not receive a 2-level reduction for acceptance of responsibility. *Id.* at 149, 151. The government attorney further maintained that the guidelines did not adequately consider that Riviere was simultaneously on probation for third degree assault and on parole for felony convictions in 1981, and that the court, therefore, should depart upward. *Id.* Counsel argued that several other factors, including contentions that Riviere had previously possessed crack and that the type of weapons involved, machine guns and silencers, showed Riviere to be an assassin, warranted an upward departure as they were not adequately considered in the guidelines. *Id.* at 152–53.

On the assault sentencing, the government attorney argued that, although Riviere pleaded guilty to only one count, he had assaulted five marshals. *Id.* at 158. He further contended that departure for the assault offense based on disruption of governmental functions was appropriate, as:

I would also like the Court to be mindful of the fact that because of this defendant's conduct, the commercial flight which he was scheduled to go on, the airline refused to accept him because they were concerned about the safety of their passengers. And so, Judge, the marshal had to take him back to Golden Grove and charter a private plane to take

him to Puerto Rico at a later time. That is a factor that I believe the Court should consider, and that isn't reflected or adequately covered by the calculations here.

In addition, Your Honor, on a prior occasion in September, again this defendant assaulted various Federal officers. And again, Judge, the Marshals Service had to get the Customs Department to charter their plane to take him to Puerto Rico.

So, not only did he assault Federal officers, but basically, Judge, this man interfered with a lot of Government functions and caused a lot of concern about the safety of the community. And so, in that respect, Your Honor, although we agreed that the Probation Office's calculations are correct, we would ask that the Court upwardly depart with respect to this offense also.

*Id.* at 158.

At the sentencing hearing, Riviere's attorney argued that the three firearms offenses should be grouped as he had set forth in his presentencing calculations. He made the following statement regarding the assault:

Mr. Riviere's conduct was inexcusable. He did not want to go back to Puerto Rico. He did not want to be separated from his mother who is here in the courtroom; from his common-law wife, who is here in the courtroom; from his friends, from being not able to visit with them on any regular basis; to be subjected to restrictions like if there is more than four shifts a month his family cannot visit him. Female members being searched in a somewhat objectionable way; certain religious beliefs not being acknowledged. Mr. Riviere was in a foreign situation, miles from his family. His right to practice his firmly held religion, and a religion that's recognized in this Caribbean community, which allows for certain hairstyles—not hairstyle, but a belief in the growing of the hair in a certain fashion that's not uncommon to religion. Forcibly shaven and haircut. No other—very few other prisoners who spoke his language of a similar culture.

He reacted in an unacceptable fashion by resisting.

*Id.* at 141–42.

Counsel noted that the marshal was not seriously injured; rather, he suffered some scratches and sprained fingers. *Id.* at 142. In light of the minor injuries and Riviere's desire to be near his family and attorney, counsel requested that the court sentence Riviere within the guidelines on the assault conviction concurrently with the sentence on the firearms convictions. *Id.*

Riviere made a personal statement at the sentencing hearing which purported to address his acceptance of responsibility for both the firearms and the assault offenses:

Yes. Well, first, I would like to say that I'm here facing various charges, and all this came about because I was trying to make a change in my life.

I did possess these weapons. And they might not have come like until I decided to make a change in my life.

Now, I feel that we should encourage those who try to make a change, because changes bring about changes.

If we take situations, for instance, like in South Africa, you could see that we are somewhat inside South Africa, has bring about change. If you take situations in the Soviet Union, you could see that change there has brought down the Berlin Wall. And I have seen that we should encourage those that try to make change. And that because what I set out to do, being that I was not satisfied with my life, I tried to make some changes. I was not running away from anything in St. Croix. I was not facing any charges in St. Croix. But I was not satisfied with my life. So I decided to relocate, and I had all my equipment, auto body equipment shipped. I rented a shack in Dominica to start with my work again.

Once again, I feel that in light of these weapons, I'm glad to be without them, because they could have come about in a different situation, you know. But I had problems in my life, I decided to make some changes, Your Honor, and I'm here. I made a mistake. I was punished for my mistakes, and if I had a chance to rather not travel or not make a change in my life, than to be here, I would have preferred to be here being sentenced than to continue in the lifestyle with the life I was living, you know. So, I welcome these changes that I make in my life now. I prefer that I at least try to change my life and be here, than to not be here and not to change my life, you know.

I ask the Judge to take consideration that these charges brought against me, I was already convicted of in a foreign country. And issuing me additional punishment now, I don't feel will serve—has no more a deterrent than the one I received before, you know.

Once again, we should encourage those that try to make changes. Thank you.

*Id.* at 159–61.

In response to the court's query about why he would take an arsenal of weapons if he intended to change his life, Riviere stated:

Well, I was, as you could say, in a confused state. I was drug dependent, and it's a question of what to do with them, you know what I mean. Turn them into the Police or do something. But what to do with them, you know. I'm just glad that it was a possession, you know what I mean, and nothing did ever come from possessing them.

Like I said, I'm sorry for my mistakes. My mistakes come about through trying to change my life. One cannot fault someone for trying to change his life, and a leopard trying to change the spots, you might find one or two there. But the point is that changes that come from inside is changes that come about. You could instill many different absences and someone trying to change their life, but unless they are willing to change their life themselves, not much change will come about. And I made a step. It might have been in the wrong direction, but at least I did something, you know. There was no intent on my part. I have never been in Dominica in how long. I

had no intent, just that something that I possessed.

*Id.* at 161.

The district court did depart on the assault offense, but did so exclusively by reason of disruption of governmental functions under guidelines § 5K2.7,[9] stating during sentencing:

> Further, I believe that the Court should depart on [the assault] offense, to the Chapter 532.7 (sic) departure for the disruption of Governmental functions. The conduct of this defendant, immature conduct, though it was, totally useless conduct, though it was, but nevertheless purposely engaged in by him knowingly so disrupted the Governmental functions, that it was necessary for the US Marshals to use five men to transport him. They could not take him on a plane that had been arranged for his transport. The Marshals had to charter a plane in order to take him. I would depart upward and impose on that offense a term of twenty-four months.

App. at 163–64.

The district court did not comment on the possibility of an upward departure based on Riviere's awaiting sentencing on the firearms offense, as had been suggested in the presentence report. Nor did the court consider Riviere's statement to be an acceptance of responsibility for the assault and, therefore, it refused to credit Riviere 2 levels in calculating his offense level under the guidelines. *Id.* at 163. Ultimately, the court sentenced Riviere within the guidelines to a general sentence of 24 months on the firearms charges, and a 24-month sentence on the assault charge against the marshal, an upward departure, to be served consecutively to the firearms sen-

tence, as well as a term of supervised release. *Id.* at 9, 11.

## II. DISCUSSION

### A. Riviere's Rights under the Extradition Treaty

■ Riviere contends that his extradition violated the "rule of specialty" provided in the treaty because he was charged with crimes for which he was not surrendered. Riviere also argues that his prosecution on the firearms charges violated the double jeopardy provision of the treaty because he had previously pleaded guilty to the firearms violations in Dominica. He further contends that it was a sham to extradite him for an offense involving three grams of marijuana because the United States government knew that the offense was not a basis for extradition. Additionally, he asserts that the Dominican prosecutor would not have been able to prove importation of marijuana; rather, "he would at best be able to prove the lesser offense of possession" carrying a six-month penalty and which, under the extradition treaty, is *not specifically included as an extraditable offense* and which does not carry a sufficient penalty under Article III(a) of the treaty to constitute an extraditable offense (the "dual criminality" provision). Furthermore, he asserts that his conviction on the firearms offenses denied him due process of law.

The government contends that Riviere seeks to assert rights possessed only by Dominica as a party to the treaty. The government therefore contends that inasmuch as Dominica expressly waived any right of objection and protest, Riviere cannot assert rights under the treaty.[10]

9. This section provides:

> If the defendant's conduct resulted in a *significant disruption* of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily *would not be justified* when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent

in the offense, and *unless the circumstances are unusual* the guidelines will reflect the appropriate punishment for such interference. Guidelines § 5K2.7 (emphasis added).

10. Riviere's contention that his extradition and subsequent trial on firearms offenses violates the provisions of the applicable extradition treaty and denied his right to due process of law, the prohibition against double jeopardy, and the rule of specialty provided in the treaty raise questions of law subject to plenary review. *Dent v. Cunningham,* 786 F.2d 173, 175 (3d

We conclude that Riviere cannot assert rights under the treaty in light of the express waiver of the Commonwealth of Dominica. It therefore follows that his conviction on the firearms offenses does not violate the rule of specialty or any other rights which Riviere is asserting under the treaty. We further hold that his extradition for the marijuana offense was not a sham and that he was not denied due process of law.

### 1. Rule of Specialty

The rule of specialty in the treaty provides that a person extradited shall not be "detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted" until he has returned to the territory of the requested party or for 30 days is free to do so. App. at 193. The Supreme Court acknowledged the right of a person extradited pursuant to a treaty to invoke the rule of specialty to avoid prosecution in *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), a case before it on a certificate of division of opinion between the circuit judges when the defendant, Rauscher, moved to arrest the judgment following his conviction. The Court there held that:

> a person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had be forcibly taken under those proceedings.

*Id.* at 430, 7 S.Ct. at 246.

The government of Great Britain had surrendered Rauscher on a charge of murder; the United States, however, instead tried him on charges of cruel and unusual punishment of a seaman. *Id.* at 410, 7 S.Ct. at 235. Although Great Britain did not specifically object to Rauscher's trial on these charges, it had previously refused to surrender a fugitive within its borders absent a guarantee from the United States that he would not be charged with crimes other than the offense for which he was being extradited, thus suggesting that it adhered to the rule of specialty that the prosecution must be confined to the offense for which the defendant is extradited. *Id.* at 415, 7 S.Ct. at 238. Furthermore, Great Britain did not expressly waive its right under the treaty to object to Rauscher's prosecution for the cruel and unusual punishment offense.

The Court explained that in the United States under the Constitution, a treaty is the law of the land equivalent to an act of the legislature, as distinguished from other countries in which a treaty is merely a contract between nations. *Id.* at 418, 7 S.Ct. at 239–40. Much of the opinion suggests that the rights described in the treaty are conferred upon individuals rather than the government. For example, the Court stated:

> '[A] treaty may also contain provisions *which confer certain rights upon the citizens* or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and *which are capable of enforcement as between private parties* in the courts of the country.... The Constitution of the United States places such provisions as these in the same category as other laws of Congress.... A treaty, then, is the law of the land, as an act of Congress is, whenever its provisions prescribe a rule by which *the rights of the private citizen* or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.'

Cir.1986). *See also Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d

Cir.1981).

*Id.* at 418–19, 7 S.Ct. at 240 (emphasis added) (quoting *Edye v. Robertson (Head Money Cases)*, 112 U.S. 580, 598–99, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884)).

In discussing the rule of specialty, the Court also stated "it is conclusive upon the judiciary of *the right conferred upon persons brought from a foreign country into this* under such proceedings." 119 U.S. at 424, 7 S.Ct. at 243 (emphasis added). Thus, Rauscher could not be prosecuted for an offense for which he had not been extradited.

On the same day that it decided *Rauscher*, the Court released its opinion in *Ker v. Illinois*, 119 U.S. 436, 438, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886), holding that a defendant kidnapped in Peru and forcibly removed to the United States could be tried in a state court for larceny without a violation of his due process rights. While there was an extradition treaty between Peru and the United States, it was not a bar to the prosecution because the kidnapper did not proceed under it or use it as a pretext for arrest, and did not proceed under any pretense of authority from the United States. *Id.* at 442–43, 7 S.Ct. at 229. The *Ker* Court explained that mere irregularities in the manner in which the defendant was brought into custody did not entitle him to avoid trial. *Id.* at 440, 7 S.Ct. at 227. The Court distinguished *Rauscher* because in that case the party was duly surrendered by the asylum country under proper proceedings; therefore, "[o]ne of the rights with which [Rauscher] was thus clothed, both in regard to himself and in good faith to the country which had sent him here, was, that he should be tried for no other offence than the one for which he was delivered under the extradition proceedings." *Id.* at 443, 7 S.Ct. at 229.

In harmony with *Ker*, the Court in *Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952), later held that a defendant abducted from one state to another could not avoid prosecution on due process grounds. The courts of appeals have continued to apply the principles of *Ker* and *Frisbie*, which are referred to as the *Ker–Frisbie* doctrine. *See United States v. Zabaneh*, 837 F.2d 1249, 1261 (5th Cir.1988); *United States v. Valot*, 625 F.2d 308, 309 (9th Cir.1980); *United States v. Herrera*, 504 F.2d 859, 860 (5th Cir.1974); *United States v. Cotten*, 471 F.2d 744, 748–49 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *United States v. Vicars*, 467 F.2d 452, 455 (5th Cir.1972), *cert. denied*, 410 U.S. 967, 93 S.Ct. 1451, 35 L.Ed.2d 702 (1973); *United States v. Hamilton*, 460 F.2d 1270, 1270 (9th Cir.1972).[11]

Notwithstanding the broad language in *Rauscher*, seemingly protective of extradited defendants, many courts of appeals in cases in which the asylum nation has expressly or impliedly waived rights under an extradition treaty have determined that an individual cannot avoid prosecution by asserting individual rights under the treaty. In *Fiocconi v. United States*, 462 F.2d 475 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972), the Court of Appeals for the Second Circuit affirmed the denial of a petition for a writ of habeas corpus where the defendants were extradited based on their indictment in the District Court for the District of Massachusetts for conspiracy to import heroin, but were later indicted in the District Court for the Southern District of New York for receiving 37 kilograms of heroin. The United States Embassy in Rome requested extradition after the defendants were arrested by Italian authorities, even though narcotics crimes were not listed in the Extradition Convention between the two countries. *Id.* at 476. Significantly, however, the convention did not prohibit extradition on narcotics charges and the crimes for which the defendants were indicted in Massachusetts were also criminal offenses under Italian law. *Id.* at 476–77. After a hearing, a Florence court directed the defendants' extradition "so that they can be subjected to

---

**11.** Some courts have recognized an exception to the *Ker–Frisbie* doctrine in cases involving torture or other conscious-shocking conduct by the abductors. *See, e.g., United States v. Cordero,* 668 F.2d 32, 36–37 (1st Cir.1987); *United States v. Toscanino,* 500 F.2d 267, 275 (2d Cir.1974). Obviously we have no need to comment on this development.

judgment according to the writ of indictment against them formulated by the Grand Jury of the District Court of Appeals of Massachusetts (sic)." *Id.* The Massachusetts district court released the defendants on bail at which point they were subpoenaed to appear before a grand jury in the District Court for the Southern District of New York. When they appeared, they were arrested pursuant to an indictment for receiving 37 kilograms of heroin in the Southern District of New York. *Id.* The United States subsequently asked the Italian court to broaden the extradition order to include the New York charges; however, no response was received from the Italian government. *Id.*

The *Fiocconi* court explained that the *Rauscher* rule was designed to prevent the United States from violating its international obligations; therefore, it was essential to determine whether the asylum nation would consider the United States' prosecution of the New York indictment as a breach of the treaty. *Id.* at 480. The court concluded that Italy probably would not have objected had a superseding indictment for other narcotics offenses been filed in Massachusetts; therefore, the fact that a court in New York filed that indictment was a "technical refinement of local law," that is, venue, with which Italy was not concerned. *Id.* at 481. The court also interpreted the convention's provision that the person surrendered "shall in no case be tried for any ... crime, *committed previously* to that for which his ... surrender is asked...." as an acquiescence in the prosecution of crimes committed after the commission of the extraditable offense but before the surrender, and thus not in breach of the treaty. *Id.* at 481–82 (emphasis added).

The Court of Appeals for the Ninth Circuit reached a like result in *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986). In *Najohn*, the

court affirmed the district court's denial of a motion to dismiss where the defendant was extradited under a treaty from Switzerland for an indictment on interstate transportation of stolen property in the District Court for the Eastern District of Pennsylvania and later indicted in the District Court for the Northern District of California for the same offense, presumably on another occasion, as well as receiving stolen property and conspiracy. 785 F.2d at 1422. The *Najohn* court stated that the requesting country must live up to the promises it made to the asylum country to obtain extradition because surrender required the cooperation of the asylum state. *Id.* According to the court, protection under the rule of specialty exists only to the extent of the surrendering country's wishes because the primary concern is satisfaction of the requesting country's obligations. *Id.* The court continued that the defendant could raise whatever objection the surrendering country might raise; however, he could be tried for other crimes if the asylum country consented. *Id.* (citing *Berenguer v. Vance*, 473 F.Supp. 1195, 1197 (D.D.C.1979)). Thus, as the Swiss Embassy to the United States had sent a letter to the United States agreeing that the principle of specialty was suspended in that case, the court concluded that Switzerland had consented to prosecution on other crimes. 785 F.2d at 1422.

In *United States v. Diwan*, 864 F.2d 715, 721 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989), the Court of Appeals for the Eleventh Circuit held that the extradited individual could only assert objections to prosecutions that Great Britain, the asylum nation, might consider a breach of the applicable treaty. Therefore, notwithstanding the defendant's extradition on theft-related offenses, in light of Great Britain's express consent, she could be tried for conspiracy to persuade a minor into sexually explicit conduct.[12] 864 F.2d at 721 (citing *Fiocconi*,

---

12. Riviere relies on *United States v. Herbage*, 850 F.2d 1463 (11th Cir.1988), *cert. denied*, 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989), in which the Court of Appeals for the Eleventh Circuit recognized the debate about

whether the principle of specialty is a right of the individual or of the surrendering sovereign. 850 F.2d at 1466 & n. 7 (comparing *Najohn* and *Rauscher*). It declined, however, to decide whether the individual had the right; rather, it

462 F.2d at 482; *Najohn,* 785 F.2d at 1422; *Greene v. United States,* 154 F. 401 (5th Cir.) (offenses charged in indictment plainly charge identical offenses for which defendants extradited), *cert. denied,* 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357 (1907)). The *Diwan* court explained that the rule of specialty was designed to preserve international relationships and to protect the institution of extradition. 864 F.2d at 720 (citing *Najohn,* 785 F.2d at 1422). The court continued that the objective of *Rauscher* was to insure that the contracting nations faithfully observed the treaty; therefore, the defendant's rights under the treaty were derivative. 864 F.2d at 721. Because Great Britain's Secretary of State for the Home Office, who had the ultimate authority to determine whether extradition would be allowed, confirmed that Great Britain did not object to Diwan's prosecution on all 19 counts of the indictment, the court rejected her argument that the rule of specialty barred her prosecution on non-theft offenses. *Id.*

We are convinced that the courts of appeals in *Fiocconi, Najohn,* and *Diwan* reached the proper result. However, rather than relying on the "consent" language of these opinions, we focus on the sovereignty of a nation to control its borders and to enforce its treaties.

*Rauscher,* of course, is clearly distinguishable from this case because there the asylum nation, Great Britain, unlike Dominica here, did not consent to the defendant's prosecution on charges other than those for which he was extradited. Thus, even in the absence of any indication that Great Britain objected to Rauscher's prosecution, the Court concluded that Rauscher could raise the specialty objection if the United States failed to meet its obligations under the treaty. However, despite its extensive discussion about individual rights, *Rauscher* does not discuss the right of an individual to assert objections when the asylum nation expressly waives its right to enforce the treaty as written.

 This factual distinction between *Rauscher* and the instant case informs our result. As a sovereign nation, Dominica has certain powers over fugitives within its territory. According to *Ker v. Illinois,* an individual is not entitled to asylum on demand in the country to which he or she flees; rather, the government in that country has the power to grant asylum. 119 U.S. at 442, 7 S.Ct. at 228. The extradition treaty limits the right of Dominica to grant asylum by defining the procedure and circumstances under which Dominica must surrender that individual. *Id.* Nonetheless, a nation may expel a fugitive within its borders without a request from the nation seeking the fugitive. *Stevenson v. United States,* 381 F.2d 142, 144 (9th Cir. 1967) (immigration authorities may expel fugitives as undesirable aliens without implicating extradition treaty). Furthermore, a country may act outside an extradition treaty as a matter of international comity. *Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933) (government may voluntarily exercise power to surrender fugitive). Thus, a nation may surrender fugitives accused of crimes not named in the treaty. *Ex parte Foss,* 102 Cal. 347, 351–52, 36 P. 669, 670 (1894) (defendant surrendered by Government of Hawaiian Islands for trial on embezzlement which was not enumerated in applicable treaty).

While a treaty limits a nation's discretion to *grant* asylum, it does not change its power to *deny* asylum. When a nation waives its right to enforce extradition treaty provisions, it essentially refuses to grant asylum to the fugitive for the offense involved. Inasmuch as Dominica expressly waived its rights under the treaty to object to this country's proceedings after extradition, it effectively expressed its intention that it would not grant asylum to Riviere

assumed for the purpose of argument that the individual could assert such a right. *Id.* It held, however, that Herbage had been extradited for the crimes for which he was convicted. *Id.* Six months later, in *Diwan,* a different panel of the same court held that an individual could not assert specialty rights under a treaty, inasmuch as the asylum consented to the prosecution. 864 F.2d at 721. Surprisingly, the *Diwan* panel does not mention the *Herbage* opinion.

for any offense for which the United States intended to prosecute him, an act completely within Dominica's discretion as a sovereign nation.[13]

Dominica's waiver of objection to Riviere's trial on matters outside the scope of the extradition order was a voluntary surrender, not required by the treaty, but recognized as a matter of international comity. Prior to extradition treaties, there was no well-defined obligation for one country to surrender fugitives to another; rather, surrenders were made upon the principle of comity and at the discretion of the government whose action was sought. *Rauscher*, 119 U.S. at 412, 7 S.Ct. at 236. While extradition treaties define circumstances in which an asylum country must surrender a fugitive, they by no means limit a country's power to surrender fugitives under other circumstances, such as for crimes not listed in the treaty. By its waiver, Dominica has exercised its power to surrender Riviere as a matter of comity for charges not listed in the extradition order; Riviere has no basis for objection to its actions. Additionally, because the surrender was outside the treaty, Riviere cannot invoke its provisions to avoid prosecution. In effect, therefore, Riviere was surrendered on two bases; under the treaty for the marijuana offense and as a matter of comity for the firearms offenses.[14]

We further reject Riviere's reliance on *Rauscher* because *Ker* teaches that the mere existence of a treaty does not create individual rights in fugitives found within the borders of a party nation. *Ker*, 119 U.S. at 442, 7 S.Ct. at 228. If extradition treaties conferred individual rights, as Riviere suggests, Ker would have had the right to invoke the treaty's provisions to avoid prosecution. The Supreme Court determined that he did not have this right independently of the Peruvian government. *Id.*

In sum, we conclude that in light of the Dominican waiver, Riviere had no right under the treaty to return to Dominica at the conclusion of his case on the offense for which he was extradited before the disposition of the other charges. Our result, of course, does not emasculate the rule of specialty in the treaty because it still restricts the conduct of requesting nations when the asylum country invokes its rights under the treaty.[15]

### 2. Double Jeopardy, Dual Criminality, and Due Process

■ In addition to his specialty contention, Riviere relies on the double jeopardy and dual criminality provisions of the treaty as well as his due process rights as bars to his prosecution on the firearms offenses. Furthermore, he asserts that his extradition for the marijuana offense was a sham. US–UK Treaty, Art. V(1)(a), 28 T.I.A.S. at 230 (App. at 192); *id.* Art. III(1)(a) at 229. App. at 191. The double jeopardy provision provides that extradition shall not be granted if the person to be extradited, if proceeded against in the territory of the requested party for the offense for which his extradition is requested, would "be entitled to be discharged on the grounds of a previous acquittal or conviction in the territory of the requesting or requested Party or of a third State." The dual criminality provision sets forth that extradition shall be granted for an offense punishable under the laws of both parties "by imprisonment or other form of detention for more than one year or by the death penalty."

In Dominica, Riviere pleaded guilty to (1) possession of narcotics (3 grams of mari-

---

**13.** There has been criticism of retroactive expansion of the right of the requesting nation to prosecute the extradited defendant when, after extradition, the asylum nation waives its specialty rights, as well as criticism that in some cases the permission has come from "police functionaries rather than courts or diplomatic officials." *See* Kester, *Some Myths about United States Extradition Law,* 76 Geo. L.J. 1441, 1465–68 (1988). Here, however, there are no problems along these lines, as the waiver was exe-

cuted by the Dominican Attorney General contemporaneously with the extradition.

**14.** Of course, there can be no basis for an objection to the assault prosecution predicated on the treaty.

**15.** We are not here concerned with what the result would have been if the Dominican Attorney General had not executed the waiver on April 14, 1989.

juana); (2) possession of ammunition; (3) possession of a firearm; (4) possession of prohibited firearms; (5) failure to declare; and (6) importation of arms and ammunition. App. at 249. We, however, see no need to make an analysis of Dominican law to ascertain whether Riviere, after his guilty plea in Dominica, could have asserted a double jeopardy defense in Dominica if that country sought to prosecute him for the matters involving firearms in Information No. 89–41.[16] We reach this conclusion because there is no reason to limit the waiver by the Dominican Attorney General to the rule of specialty as the waiver was open-ended without an exclusion for the double jeopardy provision of the treaty. Thus, the comity principles we have already discussed are as applicable to the double jeopardy contention as they are to the specialty argument.

We note that Riviere does not seem to assert a double jeopardy argument under the Fifth Amendment independently of the treaty. Of course, even if he is asserting such a contention, it would be without merit, for it is well established that separate sovereigns may prosecute for the same act without violating double jeopardy protections. *United States v. Wheeler*, 435 U.S. 313, 317–18, 98 S.Ct. 1079, 1082, 55 L.Ed.2d 303 (1978) (Indian tribes are sovereigns such that a defendant may be prosecuted by both federal government and Navaho tribe for multiple crimes arising out of one act); *Bartkus v. Illinois*, 359 U.S. 121, 139, 79 S.Ct. 676, 686, 3 L.Ed.2d 684 (1959) (state's prosecution of a defendant after acquittal on a federal indictment for substantially identical facts does not violate due process clause).[17] *See also United States v. Pungitore*, 910 F.2d 1084, 1105–07 (3d Cir.1990).

■ Riviere possessed the weapons and ammunition as well as the marijuana in different jurisdictions which each prosecuted him for violations of its own statutes. While the statutes may overlap in content, "prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.'" *Wheeler*, 435 U.S. at 317, 98 S.Ct. at 1083. *See also Chua Han Mow v. United States*, 730 F.2d 1308, 1313 (9th Cir.1984).

We also reject Riviere's dual criminality claim. Initially in this regard we point out that we see no reason why the waiver by the Attorney General does not foreclose this issue, just as it does the specialty and double jeopardy contentions. We can conceive of no good reason why, if an asylum country extradites a requested person for a criminal act in the requesting state and voluntarily waives any limits on his prosecution, he cannot be prosecuted when returned to the requesting state regardless of the law of the asylum country.

In any event, even on a substantive basis, there is no merit to the dual criminality claim. The extraditable offenses were departing the United States by aircraft in possession of marijuana, prohibited in this country under 21 U.S.C. § 955, and exportation of marijuana, prohibited in this country under 21 U.S.C. § 953.[18] The rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours. Rather, it requires that the acts charged be proscribed in each nation. *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 470–71, 66 L.Ed. 956 (1922) (not necessary that of-

---

**16.** Of course, Riviere was not extradited for the firearms offenses and thus by its terms the double jeopardy provision of the treaty could not be applicable to the prosecution for those offenses. Riviere seeks to implicate the double jeopardy clause to the firearms offenses by suggesting that they were the "true offense[s] for which he was being extradited" though they were not "revealed by the United States."

**17.** The Supreme Court decided the *Bartkus* case before it held in *Benton v. Maryland*, 395 U.S.

784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), that the double jeopardy clause applies to states through the Fourteenth Amendment. Thus, in *Bartkus*, the Court discussed prosecution by multiple sovereigns in terms of the Fourteenth Amendment's due process clause rather than making a double jeopardy clause analysis.

**18.** Riviere raises the dual criminality claim in the context of the marijuana charges rather than the firearms charges.

fense have same name in each country or that scope of liability be coextensive); *Wright v. Henkel*, 190 U.S. 40, 58, 23 S.Ct. 781, 783, 47 L.Ed. 948 (1903) (absolute identity of crimes not required; sufficient where essential character of conduct is same and criminal in each nation); *Brauch v. Raiche*, 618 F.2d 843, 851 (1st Cir.1980) (offenses of two countries must be substantially analogous). The crimes enumerated in 21 U.S.C. §§ 953, 955 are recognized as offenses under Dominican law, which proscribes mere possession of three grams of marijuana. Commonwealth of Dominica Narcotics Control Act of 1969, Act No. 23, § 3 (as amended Apr. 28, 1980). Thus, there was no violation of the dual criminality principle here.

We reject Riviere's contention that his prosecution on the firearms offenses violated due process. "The 'due process of law' here guaranteed is complied with when the party is regularly indicted by the proper grand jury in the state court, has a trial according to the forms and modes prescribed for such trials, and when, in that trial and proceedings, he is deprived of no rights to which he is lawfully entitled." *Ker*, 119 U.S. at 440, 7 S.Ct. at 227. Riviere has not contended that his charging upon information or the proceedings in the District Court of the Virgin Islands suffered any defect other than those related to his extradition and we can conceive of none. Furthermore, the US–UK Treaty specifically provides for provisional arrest for up to 45 days on an application properly made through diplomatic channels. US–UK Treaty, Art. VIII. Thus, Riviere's detention until April 10, 1989, was authorized by the treaty, even though the information against him was not filed until that day.

■ Finally, we also reject Riviere's argument that the United States perpetrated a "sham" on the government of Dominica by seeking his extradition on the marijuana offense as a ruse for prosecuting him for firearms offenses. The marijuana offense

was real. In any event, there is no reason in the record to believe that Dominica would have refused his extradition on the firearms offenses. In fact, Domenica waived any treaty limitation on Riviere's prosecution and apparently was perfectly willing to see him depart.[19]

### B. Guideline on Grouping Closely–Related Counts and Combined Offense Level for Multiple Counts

As we have explained, Riviere pleaded guilty to (1) possession of firearms by a felon under 18 U.S.C. § 922(g)(1), (3) (count one); (2) delivery of firearms to a common/contract carrier under 18 U.S.C. § 922(e) (count five); and (3) possession of an altered firearm under 18 U.S.C. § 922(k) (count six). Riviere's base offense level for possession of a firearm by a felon was 9, plus a 1-level increase for an obliterated serial number for an adjusted level of 10. The district court treated each count as a separate "group" in determining the combined offense level under guidelines § 3D1.4, and thus impliedly found that the offenses were not closely-related counts under guidelines § 3D1.2. For the three groups of offenses, the court increased the base offense level for the highest offense level, 10, by 3 levels for a combined offense level of 13. Riviere received a 2-level reduction for acceptance of responsibility, for a total offense level of 11. Thus, predicated on his criminal history category of IV, the sentencing table provided for a range of 18 to 24 months for the firearms offenses. The district court sentenced Riviere to a general sentence of 24 months on these charges.

Riviere contends that the district court improperly added 3 "unit" levels pursuant to guidelines § 3D1.4 to this sentence, because it improperly determined that the firearms offenses constituted three separate "groups" of offenses under guidelines § 3D1.2. Riviere suggests that the trial court should have combined the offenses into a single group because they are closely

---

**19.** Indeed, as far as we can see this situation was worked out much in Dominica's interest. Riviere pleaded guilty in that country which then collected a substantial fine in the case and was able to pass the cost of his incarceration on to the United States. We can understand why Dominica waived the rule of specialty.

related and should have used the highest offense level as the combined offense level pursuant to the application notes to guidelines § 3D1.3. This contention requires a construction of the guidelines so that our scope of review on the contention is plenary. *United States v. Nottingham*, 898 F.2d 390, 392 (3d Cir.1990); *United States v. Ortiz*, 878 F.2d 125, 126–27 (3d Cir.1989).

There was, of course, no individual victim of these firearms offenses. Thus, the issue turns on whether offenses for which society is the victim are properly grouped together under the multiple count provisions of the guidelines which require grouping of offenses against the same victim and the same or connected transactions. Guidelines § 3D1.2, as effective here, provides that:

[a]ll counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more of the acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, including but not limited to:

(1) [a count for conspiracy or solicitation plus a count for the substantive offense that was the object of the conspiracy or solicitation]

(2) [a count charging attempt plus a count charging commission of the same offense]

(3) [a count charging offense based on general prohibition plus a count charging offense based on specific prohibition within that general prohibition].

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) Counts are grouped together if the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior....

Subsection (d) lists offenses it specifically includes and excludes; however, the firearms offenses involved here are neither specifically included or excluded. *Id.* § 3D1.2(d). Subsection (d) further provides that:

For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level.

Exclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection.

The application notes following guidelines § 3D1.2 provide that the term victim is not intended to include indirect or secondary victims. Ambiguities as to the identity of the victim should be resolved "in accordance with the purpose of this section" to "identify and group 'counts involving substantially the same harm.'" For victimless crimes in which society at large is the victim, "the grouping decision must be based primarily upon the nature of the interest invaded by each offense." *Id.*, application note 2.

■ Riviere contends that either subsection (a) or (b) applies to the firearms offenses, presumably because society was the same "victim" for all offenses. His best argument, however, is predicated on subsection (c), which provides for grouping of offenses in which one count is also a specific offense characteristic of another count. The guidelines provide that the base offense level for possession of a firearm by a felon is increased for specific offense characteristics if that firearm has an altered or obliterated serial number, and there was such an increase here. Riviere also pleaded guilty under count six to pos-

session of a firearm with an altered or obliterated serial number, the same conduct treated as a specific offense characteristic in count one. Thus, these two offenses should have been grouped as closely related counts under guidelines § 3D1.2(c).

■ Riviere cites *United States v. Berkowitz*, 712 F.Supp. 707 (N.D.Ill.1989), in support of his argument that subsection (a) or (b) required that the trial court group counts one and five because they arose from a single incident affecting one victim. In *Berkowitz*, the district court rejected the government's argument that counts for obstruction of justice (counts I and II) and stealing government property (count III) should not be combined because the offenses affected multiple victims, that is, society at large and the United States Attorney's office. *Id.* at 710. The defendant stole documents from that office material to a separate mail and tax fraud prosecution against him. *Id.* at 708. The court explained that the office is a representative of society and not a separate victim. *Id.* at 710. Finding that the three counts involved substantially the same harm because they related to the same victim, that is, society, and the same criminal objective, the court grouped the three offenses under guidelines § 3D1.2, presumably pursuant to subsection (a). 712 F.Supp. at 710.

Riviere's argument that subsection (a) or (b) required grouping of the offenses is problematic in view of the clarifying amendment, effective November 1, 1989, to the background commentary to the application notes to guidelines § 3D1.2, which provides that "[c]ounts involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in subsection (c) or (d)." *See United States v. Ofchinick*, 877 F.2d 251, 257 n. 9 (3d Cir.1989). However, the application note discussing the term "victim," which appears in guidelines § 3D1.2(a) and (b), provides that, for victimless crimes in which society at large is the victim, "the grouping decision must be based primarily upon the nature of the interest invaded by each offense." *Id.*, application note 2.

Because the commentary is not entirely clear, it is appropriate to refer to the stated purpose of Part D to determine whether counts one and five should be grouped. *See id.*, background commentary ("[i]n interpreting this Part and resolving ambiguities, the court should look to the underlying policy of the Part as stated in the Introductory Commentary."). The introductory commentary to Part D provides that some offenses are "so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range." It uses embezzlement and falsification of records as an example of offenses which, even though legally distinct, "represent essentially the same type of wrongful conduct with the same ultimate harm" that are appropriately treated as a single offense for sentencing. *Id.* Thus, it is clear that "multiple counts" are not restricted to two or more counts of the same statutory violation, but may include violations of different statutes.

Likewise, the introductory commentary provides that "[c]onvictions on multiple counts do not result in a sentence enhancement unless they represent *additional conduct* that is not otherwise accounted for by the guidelines." *Id.* (emphasis added). One of the offenses stems from Riviere's *status* as a felon rather than his *conduct*. Because one of the offenses, delivery of firearms to a common/contract carrier, required that Riviere possess the firearms, it follows that Riviere's sentence was enhanced due to his *status* rather than his *conduct*. Thus, for these two offenses, the policies underlying the multiple count provision support the interpretation that, because the offenses affect the same victim, society, the court should group them. Additionally, if society may serve as the same victim for two offenses, counts one and six, there seems little basis to reject it as the basis for the third.

While the government argues that the district court correctly refused to group because the offenses require proof of different elements, it cites no authority for its contention that the presence of different elements precludes grouping and, in fact, this argument misstates the law and we

reject it. The guidelines anticipate that offenses requiring proof of different elements will be grouped; for example, they provide grouping for conspiracy and the substantive offense that was the sole object of the conspiracy which clearly require proof of different elements. *See* guidelines § 3D1.2(b)(1). Another example provides that grouping is appropriate for kidnapping and assaulting the same victim. *Id.*, application note 3, example 2. Additionally, application note 4 states that "counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, *even if they constitute legally distinct offenses occurring at different times.*" (Emphasis added).

The government also argues that guidelines § 3D1.2(d) does not list firearms offenses as offenses to be grouped.[20] But neither does subsection (d) *exclude* firearms offenses. In any event, we must make a "case-by-case determination ... based on the facts of the case and the applicable guidelines ... used to determine the offense level." *Id.* § 3D1.2(d).

Overall, we conclude that the three offenses are of the type that the Commission intended to be "grouped" under guidelines § 3D1.2; therefore, the district court erred in its application of the guidelines. The guidelines already provided for enhanced punishment for possession of a firearm by a felon if that firearm was altered; to enhance the penalty further by adding a "unit" for the count for possession of an altered firearm clearly violates guidelines § 3D1.2(c) which requires grouping for these offenses. Additionally, grouping of the offenses of possession of a firearm by a felon and delivery to a common/contract carrier was required because to hold otherwise would provide enhanced punishment for Riviere's status as a felon, rather than his "additional conduct that is not otherwise accounted for by the guidelines." *Id.* Part D, introductory commentary. We will, therefore, vacate Riviere's sentence and remand for resentencing, grouping the

three firearms offenses for purposes of determining Riviere's combined offense level.

We find support for our result in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir.1990). There, various firearms offenses were grouped, the most serious offense being for transporting an explosive in interstate commerce, with the knowledge or intent that it will be used to kill, injure, or intimidate an individual or unlawfully damage or destroy property. 18 U.S.C. § 844(d). We find it particularly significant that one count grouped was for the possession of a firearm by an illegal alien. 18 U.S.C. § 922(g)(5). Thus, *Kikumura*, as here, involved an offense in part predicated on status, and in *Kikumura* there was grouping, though that issue seemed not to be in dispute. *See Kikumura*, 918 F.2d at 1093–94, & n. 6 & n. 8. *See also United States v. Scott*, 914 F.2d 959, 960–61 (7th Cir.1990). We think that it is also significant that one court has indicated that the guidelines, including § 3D1.2(d), provide "for grouping where the offenses in question constitute part of the same continuing, common criminal endeavor." *United States v. Porter*, 909 F.2d 789, 793 (4th Cir.1990). We acknowledge, however, that, at least with respect to counts one and five, a different result could be reached if the focus is placed on the societal interest involved. *See United States v. Pope*, 871 F.2d 506, 510 (5th Cir.1989); *see also United States v. Egson*, 897 F.2d 353, 354 (8th Cir.1990).

### C. Upward Departure for Riviere's Assault Conviction

◼ The base offense level for violation of 18 U.S.C. § 111 (assault on a federal marshal) is in guidelines § 2A2.4(a). Because Riviere physically contacted the marshal, the base offense level of 6 was increased by 3 levels to 9. Inasmuch as his criminal history category was IV, the guidelines provided for a range of 12 to 18 months.

Riviere contends that the trial court erred in departing upward for his convic-

---

**20.** Effective November 1, 1990, this is no longer so.

tion on assault of a federal officer based on disruption of governmental functions. *See supra* note 9 for text of guidelines § 5K2.7. In determining whether the district court properly departed on this basis, we must consider whether an aggravating circumstance exists here that was not adequately considered by the Commission. This court recently set forth the scope of its review for the district court's departure from the guidelines in *United States v. Kikumura:*

> A district court must sentence within the applicable guideline range 'unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' 18 U.S.C. § 3553(b). 'This provision is mandatory.' *United States v. Uca,* 867 F.2d 783, 786 (3d Cir.1989). Thus, if the circumstances relied upon by the district court to justify departure were adequately considered by the Sentencing Commission, then its decision to depart must be reversed. *See* 18 U.S.C. § 3742(f)(1). Our scope of review of this question is plenary. *See United States v. Ryan,* 866 F.2d 604, 610 (3d Cir.1989). Of course, the circumstances relied upon must in fact exist in the case under consideration, but we are obliged to 'accept the findings of fact of the district court unless they are clearly erroneous.' 18 U.S.C. § 3742(e).

> Once we conclude that a departure is not prohibited by § 3553(b), we must still determine whether the sentence imposed was reasonable, 'having regard for—(A) the factors to be considered in imposing a sentence, as set forth in [18 U.S.C. § 3553(a)]; and (B) the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c).' 18 U.S.C. § 3742(e)(3). This determination 'involves at least two subissues: whether the factors relied on are appropriate; and whether the degree of departure was appropriate.' *Ryan,* 866 F.2d at 610. At

this stage of the inquiry, our scope of review is deferential. *See id.*

*Kikumura,* 918 F.2d at 1098 (omitting footnotes).

With respect to this departure, the district court's factual determination, above quoted, that Riviere's assault of the marshal required five marshals to transport him to the airport is clearly erroneous. Five marshals were transporting Riviere when the assault occurred on October 25, 1989, and therefore Riviere was originally charged with five counts of assault of a federal marshal. Thus, if five marshals were required to transport him at a later date, it did not "disrupt" government functions. Rather, the marshals were performing the same function as when the assault occurred. Accordingly, this factual predicate for disruption of governmental functions is clearly erroneous.

However, the district court also stated that "[the marshals] could not take him on a plane that had been arranged for his transport. The Marshals had to charter a plane in order to take him." App. at 164. To determine whether this fact, standing alone, constitutes a significant disruption of governmental function sufficient to warrant departure from the guidelines requires a plenary review of the underlying policies and case law.

Guidelines § 5K2.7 sets forth the policy underlying departure for disruption of governmental functions that "unless the circumstances are unusual the guidelines will reflect the appropriate punishment" where interference with a government function is inherent in the offense of conviction. Additionally, the general policy statement on grounds for departure, guidelines § 5K2.0, states that, where the disruption of governmental functions is inherent in the offense, the "disruption of a governmental function ... *would have to be quite serious* to warrant departure from the guidelines." Guidelines § 5K2.0 (emphasis added).

At least one court has held that a departure based on disruption of governmental functions is inappropriate "when, in fact, the government was performing exactly as it was supposed to." *United States v.*

*Singleton*, 917 F.2d 411, 414 (9th Cir.1990). In *Singleton*, the Court of Appeals for the Ninth Circuit vacated the defendant's sentence because the district court improperly departed upward based in part on disruption of governmental function. *Id.* at 415. The defendant had escaped from prison and eluded a police roadblock in November 1987. *Id.* at 412. At that time, an officer found a loaded revolver in a backyard through which the defendant had fled. *Id.* In March 1988, the defendant forced his way past a state trooper who had stopped the truck in which he was a passenger, injuring the officer in the process. *Id.* He then fled to a nearby field, where he was later captured. *Id.* He was charged with possession of a firearm by a felon. *Id.*

The court of appeals noted that the district court "conclusorily" departed upward based on disruption of governmental function and did not set forth the facts that supported such a departure. *Id.* at 414. Searching the record, the appellate court concluded that the defendant had caused police to engage in two searches; first, in November 1987, and second, in March 1988. *Id.* The court rejected the government's assumption that a police department's normal function did not include searching for criminals. *Id.* It found that the case did not present a situation in which "a criminal diverted a government employee away from that employee's normal responsibilities." *id.* The court discussed *United States v. Garcia*, 900 F.2d 45, 48–49 (5th Cir.1990) (over 700 pieces of mail stolen and some destroyed by defendant),[21] which it concluded was distinguishable because the defendant's offense in *Garcia* was "so extensive that it caused more disruption than inherent in the offense." 917 F.2d at 414.

Other cases in which courts departed based on disruption of governmental function are instructive as to the degree of disruption contemplated by the guidelines. In *United States v. Murillo*, 902 F.2d 1169

(5th Cir.1990), the Court of Appeals for the Fifth Circuit upheld the district court's departure on this basis for the defendant's conviction for immigration laws violations where the district court found that "the integrity of the amnesty system in the Eastern District of Louisiana [was] severely compromised because of the illegal acts of" the defendant. *Id.* at 1174. The defendant was "in the business" of selling false documents to "countless" illegal aliens and providing for their transportation. *Id.* at 1171.

In *United States v. Burns*, 893 F.2d 1343 (D.C.Cir.), *cert. granted*, —— U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990), the Court of Appeals for the District of Columbia Circuit held that departure for disruption of governmental function was appropriate for convictions of theft of government funds because the defendant, a government employee, diverted government resources and used federal mechanisms to perpetrate his crimes. 893 F.2d at 1347. Over the course of six years, the defendant had used his position as a supervisor in a federal agency to authorize payments of unused travel funds which he then diverted to his own use. *Id.* at 1344. The court explained that the defendant's manipulation of the agency's procurement apparatus, which required the unwitting assistance of many government employees who were diverted from their legitimate tasks, was readily distinguishable from crimes involving basic theft of government property, such as stealing supplies. *Id.* at 1347.

Based on the language and policy of guidelines § 5K2.7, Riviere's assault of the marshal clearly falls short of the threshold required for departure for disruption of governmental function. Assault of a federal marshal inherently disrupts a governmental function because it interferes with the marshal's performance of his or her duties; thus, the disruption of the marshals' ordinary activity "would have to be

---

**21.** The *Garcia* court noted that some disruption of governmental function is inherent in the crime of theft of mail by a postal employee; however, it found that the volume of mail, the largest amount seen by a postal inspector in 20 years, plus the fact that some of the mail was destroyed constituted an "unusual circumstance" warranting upward departure. 900 F.2d at 49. The offenses occurred between December 27, 1988, and February 6, 1989. *Id.* at 46.

quite serious to warrant departure from the guidelines." Guidelines § 5K2.0. The policy underlying the rule contemplates a *significant* disruption of governmental function; however, rescheduling Riviere's transportation to Puerto Rico was a one-time effort by the marshal's office in which the marshals were performing their usual functions, that is, arranging the transportation of a convicted criminal. That the marshals had to repeat their task is neither unusual nor significant because an assault on a marshal during transportation of a prisoner is likely to require that other arrangements be made, for example, postponing the trip or increasing the number of marshals accompanying the prisoner. As in *Singleton*, the amount of resources to devote to this job "was a decision controlled entirely by" the marshal's office. *Singleton*, 917 F.2d at 414. This case simply does not rise to the level of one which, in our words in *Kikumura*, "directly obstructs or impedes the normal operation of government." 918 F.2d at 1084. Certainly if the marshals had from the start considered Riviere to be so dangerous that his transportation required a private plane for the flight to Puerto Rico and Riviere fully cooperated, no departure would be possible. That the marshals made such arrangements after the assault, an event which in this case did require the marshals to make alternative arrangements, does not transform the task into a significant disruption of governmental function.

Even if the disruption were not inherent in the offense of assaulting a marshal, we find that the disruption here was not of the nature or kind for which the Commission intended an upward departure. The degree of disruption here does not compare to the six-year long pattern of embezzlement in *Burns* in which the defendant used government employees to perpetrate his crime. *Burns*, 893 F.2d at 1347. Likewise, Riviere was not in the business of assaulting federal officers. *See Murillo*, 902 F.2d at 1174. The disruption here was of short duration and was not a continuing pattern of conduct. *Garcia* is also distinguishable based on the degree of disruption; the postal inspector in *Garcia* testified that he had

never seen such a large amount of mail stolen in twenty years. *Garcia*, 900 F.2d at 49.

We note that the guidelines for the offense supports our interpretation. Assault of a federal marshal is an independent offense punishable under the guidelines. *See* guidelines § 2A2.4. The application notes to this section provide that "the base offense level reflects the fact that the victim was a governmental officer performing official duties." *Id.*, application note 1. It continues that "the base offense level does not assume any *significant* disruption of governmental functions." *Id.*, application note 3 (emphasis added). Inasmuch as the guidelines require a *significant* disruption of governmental function to warrant departure, Riviere's conduct does not rise to the level of an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). Because the circumstances relied on by the district court were adequately considered by the Commission, its decision to depart on the basis of disruption of governmental function must be reversed. *See Kikumura*, 918 F.2d at 1098; 18 U.S.C. § 3742(f)(1).

**D. Acceptance of Responsibility for the Assault on the Marshal**

 Riviere contends that the judge erroneously failed to depart downward for his acceptance of responsibility on his sentencing for assault of the federal marshal. We review the district court's determination that Riviere did not accept responsibility under the "clearly erroneous" standard. *United States v. Ortiz*, 878 F.2d at 128.

There is nothing in Riviere's statement that even arguably accepts responsibility for the assault. The district court's determination that Riviere did not accept responsibility for the assault, therefore, was not clearly erroneous. *See United States v. Singh*, 923 F.2d 1039 (3d Cir.1991).

**III. CONCLUSION**

We cannot conclude without acknowledging the high quality of the briefs and

**1310**

oral presentation of counsel, which have been of great assistance to us in our resolution of the difficult issues in this case. In light of our conclusion that Riviere may not assert rights with respect to his extradition because of the express waiver of the Commonwealth of Dominica, we will affirm the judgment of conviction on the firearms offenses. We have concluded, however, that the district court erred in applying the guidelines by failing to group the firearms offenses for purposes of calculating Riviere's combined offense total and in departing upward on Riviere's assault conviction based on disruption of governmental functions. We will therefore vacate his sentence on both his firearms and assault convictions and remand for resentencing.